IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| Ligure Ellington, | ) | C/A No. 2:15-1804-MGL-PJG |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| Metropolitan Security Services, Inc. (also | ) | |
| known as Walden Security, Inc.), | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

  The plaintiff, Ligure Ellington, filed this employment action alleging race discrimination pursuant to 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e, et seq.; harassment and retaliation pursuant to Title VII; and violations of state law against his former employer, Metropolitan Security Services, Inc. (also known as Walden Security, Inc.). This matter is before the court pursuant to 28 U.S.C. § 636(b) and Local Civil Rule 73.02(B)(2) (D.S.C.) for a Report and Recommendation on the defendant's motion for summary judgment. (ECF No. 39.) Ellington filed a response in opposition (ECF No. 47), and the defendant replied (ECF No. 55). Having reviewed the parties' submissions and the applicable law, the court finds that the defendant's motion for summary judgment should be granted.

## BACKGROUND

  The following facts are pertinent to the resolution of the pending motion for summary judgment. They are either undisputed or are viewed in the light most favorable to Ellington, to the extent they find support in the record. Ellington, who is African American, worked for the defendant as a Lead Court Security Officer ("LCSO") assigned to the federal courthouse in Charleston, South

Carolina from February 2012—when the defendant acquired the contract to provide security for the courthouse—through April 23, 2014. Ellington began working for the defendant's predecessor in 1997 as a Court Security Officer ("CSO") after retiring from the Charleston police force and later was elevated to an LCSO. Ellington testified that LCSOs assigned work and set shift schedules for the other CSOs in the Charleston courthouse, but they had no authority to discipline other CSOs.

This action arises out of the defendant's investigation of Ellington following a complaint by CSO Rembert Butler (Caucasian), the defendant's decision to demote Ellington as a result of the investigation, and Ellington's separation from employment with the defendant. On April 3, 2014, Butler contacted the defendant's Human Resources Department and complained that Ellington favored certain CSOs in job assignments, overlooked infractions by certain CSOs, and displayed emotional outbursts by screaming and cursing at CSOs. Additionally, Butler reported an incident that had occurred that day between Ellington and CSO Al Buford (African American).

With regard to the alleged incident, the undisputed evidence shows that Buford was called into a meeting with LCSO Lowell Carroll (Caucasian) and Ellington to address Buford's failure to answer his radio. Michael Cartee (Caucasian), the District Supervisor of South Carolina and Ellington's direct supervisor, participated in this meeting by phone.[1]  Ellington testified that at the beginning of the meeting when he asked Buford to close the door, Buford kicked the doorstop out of the door causing it to fly into the hallway before then slamming the door. According to Ellington, he asked Buford, "[W]hat in the hell is wrong with you?" and directed Buford to go retrieve the doorstop. (Pl.'s Dep. 163, ECF No. 39-2 at 42.) Ellington stated that when Buford went to get the

---

[1] Cartee testified that his responsibilities included investigating complaints and other reported problems at the federal courthouses, but that he had no authority to take disciplinary action.



doorstop, an officer outside the door handed it to Buford and Buford "brought it back and slammed it on the desk." (Id. at 163-64.) Ellington told Buford to close the door, but Buford sat there refusing to close it. Ellington got up to close the door and when he pushed the door, "it made a noise." (Id. at 164.) Ellington admitted that the noise happened because his "temper ha[d] flared by now" and indicated that if Buford had come into the office, closed the door, and sat down, that the incident would not have happened. (Id.) Ellington stated that Carroll then contacted Cartee who participated in the remainder of the meeting via telephone. After Ellington updated Cartee on the events that had just occurred, Cartee asked for Buford's version of events. Ellington testified that "Buford started out by saying that [Ellington] had been riding him for the last two or three weeks" and Ellington admitted to saying with an elevated voice, "[T]hat's a damn lie." (Id. at 165, ECF No. 39-2 at 43.) Ellington stated that Cartee said they were acting like children and told them to shake hands. Ellington and Buford ultimately shook hands but Ellington did not appreciate the way Cartee handled that situation.[2] However, Ellington stated that when he contacted Cartee the next day to express his displeasure, Cartee told Ellington that it was "a lot bigger than that now," informing Ellington that a complaint about Ellington had been submitted and that Cartee was coming to Charleston to investigate it. (Id. at 166.)

During the incident with Buford, several CSOs were just outside the room. One of those CSOs was Butler, who, as stated above, contacted the defendant's Human Resources Department to complain about Ellington. (See ECF No. 39-7.) Thereafter, the defendant instructed Cartee to conduct an investigation into Butler's complaint. As part of his investigation, Cartee requested and

---

[2] Also during this call, the participants discussed Buford's failure to be stationed at his post on time and to answer the radio when contacted.



obtained written statements from seventeen CSOs and the three LCSOs, including Ellington. He also conducted interviews.

Cartee completed a Summary of Investigation Report dated April 17, 2014, which included the following:

> On 4-7-14, this investigation concluded the allegation that LCSO Ligure Ellington displays emotional outburst occasionally is **SUSTAINED**.
> That LCSO Ellington shows favoritism toward certain CSOs is **SUSTAINED**.
> Violation of CSO Performance Standard C.14.2.14.  Not use abusive or offensive language, engage in quarreling, intimidation by words or actions, fighting, or other disruptive activities is **SUSTAINED**.

(ECF No. 39-8 at 2.)  The report also included Cartee's summary of the employees' statements, and the following conclusion:

> LCSO Ellington's accusation of emotional outburst was confirmed by 11 of the 20 CSOs interviewed.  Nine CSOs of the 20 interviewed confirmed favoritism shown by Ellington.  The 3 CSOs (Brown, Gabe and Harris) were identified by everyone confirming favoritism as the CSOs in question.
> While conducting an interview between Ellington and Buford on 4-5-14 I, Mike Cartee, DS, personally witnessed emotional outburst by LCSO Ellington by him elevating his voice directed at CSO Buford.

(Id. at 5.)  Cartee attached all of the written statements to the report.

Dickie Wong, the defendant's Vice President of Federal Services, and his management team reviewed Cartee's report, including the attachments.  The members of the management team all agreed Ellington's demotion from LCSO to CSO was the appropriate action, and on April 23, 2014, Ellington was notified of Wong's decision to demote him from LCSO to CSO.  According to LCSO Carroll, Ellington contacted him on April 24, 2014, turned over his identification card, his access card, and his keys to Carroll, and told Carroll that he could not come back to the courthouse. (ECF No. 39-13.)



Ellington filed the instant action on April 27, 2015, asserting race discrimination in violation of Title VII and 42 U.S.C. § 1981 and retaliation and hostile work environment in violation of Title VII, as well as state law claims of breach of contract and wrongful discharge in violation of public policy. In support of his claims, Ellington argues that the investigation was flawed and that the outcome was predetermined. Specifically, Ellington challenges the accuracy of Cartee's summary of the employees' statements and contends that Cartee encouraged and emphasized negative comments. Ellington also alleges that he was constructively discharged.

## DISCUSSION

A.     **Summary Judgment Standard**

Summary judgment is appropriate only if the moving party "shows that there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party may support or refute that a material fact is not disputed by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* [dispute] of *material fact*." Ballinger v. N.C. Agric. Extension Serv., 815 F.2d 1001, 1005 (4th Cir. 1987) (emphasis in original) (internal quotation marks and citation omitted). A fact is "material" if proof of its existence or non-existence would affect the disposition of the case under the applicable law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. Id. at 257.



In discrimination cases, a party is entitled to summary judgment if no reasonable jury could rule in the non-moving party's favor. Dennis v. Columbia Colleton Med. Ctr., Inc., 290 F.3d 639, 645 (4th Cir. 2002). The court cannot make credibility determinations or weigh the evidence, but the court should examine uncontradicted and unimpeached evidence offered by the moving party. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). The court must determine whether a party's offered evidence is legally sufficient to support a finding of discrimination and look at the strength of a party's case on its own terms. See id. at 148 (stating that "[c]ertainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational fact-finder could conclude that the action was discriminatory").

**B.     Burden Shifting Framework**

A plaintiff may demonstrate discrimination through direct or circumstantial evidence. When direct evidence is lacking, as it is here, a plaintiff may produce circumstantial evidence and proceed under the McDonnell Douglas burden-shifting framework. Warch v. Ohio Casualty Ins. Co., 435 F.3d 510, 520 (4th Cir. 2006); see also McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). Pursuant to this framework, once the plaintiff establishes a *prima facie* case of discrimination, the burden shifts to the defendant to produce evidence of a legitimate, nondiscriminatory reason for the adverse action. Merritt v. Old Dominion Freight, 601 F.3d 289, 294 (4th Cir. 2010) (Title VII). The defendant's burden "is a burden of production, not persuasion." Reeves, 530 U.S. at 142. Once a defendant meets this burden by producing affidavits or testimony demonstrating a legitimate, nondiscriminatory reason, "the McDonnell Douglas framework—with



its presumptions and burdens—disappear[s], and the sole remaining issue [is] discrimination *vel non*." Id. (internal quotation marks and citations omitted).

In other words, if the defendant meets the burden to demonstrate a legitimate, nondiscriminatory reason, the plaintiff must demonstrate by a preponderance of the evidence that the proffered reason was "not its true reason[], but [was] a pretext for discrimination." Merritt, 601 F.3d at 294 (quoting Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981)). Accordingly, the plaintiff's burden of demonstrating pretext "merges with the ultimate burden of persuading the court that [the plaintiff] has been the victim of intentional discrimination." Merritt, 601 F.3d at 294 (quoting Burdine, 450 U.S. at 256) (alterations in original); see also Diamond v. Colonial Life & Accident Ins. Co., 416 F.3d 310, 319 (4th Cir. 2005) (Title VII & 42 U.S.C. § 1981). To meet this "merged" burden, the employee may prove by a preponderance of the evidence that the decision maker's affidavit is untrue or that the employer's proffered explanation is unworthy of credence. Burdine, 450 U.S. at 256.

"[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, *may* permit the trier of fact to conclude that the employer unlawfully discriminated." Reeves, 530 U.S. at 148. However, "if the record conclusively reveal[s] some other, nondiscriminatory reason for the employer's decision, or if the plaintiff create[s] only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred," summary judgment is appropriate. Id. Accordingly, the court must evaluate "the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as

Page 7 of 19



a matter of law." Id. at 148-49. "Notwithstanding the intricacies of proof schemes, the core of every [discrimination] case remains the same, necessitating resolution of the ultimate question of . . . whether the plaintiff was the victim of intentional discrimination." Merritt, 601 F.3d at 294-95.

**C.     Ellington's Claims**

    **1.     Title VII**

        **a.     Disparate Treatment/Discipline**

The elements of a *prima facie* case of discriminatory disparate treatment are: (1) membership in a protected class; (2) adverse employment action; (3) satisfactory job performance; and (4) different treatment from similarly situated employees outside of the protected class. See Coleman v. Maryland Court of Appeals, 626 F.3d 187, 190 (4th Cir. 2010) (citing White v. BFI Waste Servs., LLC, 375 F.3d 288, 295 (4th Cir. 2004)).  Similarly, to establish a claim of disparate discipline, a plaintiff must show:  (1) that he engaged in prohibited conduct similar to that of a person of another race, color, sex, religion, or national origin; and (2) that disciplinary measures enforced against him were more severe than those enforced against the other person.  Lightner v. City of Wilmington, 545 F.3d 260, 264-65 (4th Cir. 2008).  To prevail on either theory, Ellington must show that an employee outside the protected class who was similarly situated to him was treated more favorably.  See Coleman, 626 F.3d at 190 (requiring a plaintiff to demonstrate that other employees outside the protected class were treated differently); Lightner, 545 F.3d at 264-65 (requiring a plaintiff to show that she engaged in prohibited conduct similar to that of a person of another race, color, sex, religion, or national origin).

    To be similarly situated and thus permit a valid comparison, the employees outside the protected class must have dealt with the same decision maker, been subject to the same standards,



and engaged in the same conduct without mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it. Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir. 1992) (Title VII & ADEA) (defining "similarly situated");[3] see also McGuinness v. Lincoln Hall, 263 F.3d 49, 53-54 (2d Cir. 2001) (emphasizing that an employee must be similarly situated in all material respects); Haywood v. Locke, 387 F. App'x 355, 359 (4th Cir. 2010) (stating that "plaintiffs are required to show that they are similar in all relevant respects to their comparator").

The parties do not dispute that Ellington is a member of a protected class and that his demotion constituted an adverse employment action;[4] however, Ellington cannot establish a *prima facie* case because he presents no evidence that any similarly situated person outside of his protected class was treated differently. Specifically, he has failed to identify any comparators that are similarly situated to him in all *relevant* respects. See Mitchell, 964 F.2d at 583; see also Haywood v. Locke, 387 F. App'x 355, 359 (4th Cir. 2010). Relevant here, Ellington "must demonstrate that his prohibited conduct was comparable in seriousness to the misconduct of other employees." Forrest v. Transit Mgmt. of Charlotte, Inc., 245 F. App'x 255, 256 (4th Cir. 2007) (citing Cook v. CSX Transp. Corp., 988 F.2d 507, 511 (4th Cir. 1993)). Ellington must "provide evidence of prior employee incidents that were sufficiently similar 'in light of the harm caused or threatened to the

---

[3] The Fourth Circuit has not issued a published case on this point; however, the following unpublished cases have cited with approval the Mitchell decision: Atkins v. Holder, 529 F. App'x 318, 321 (4th Cir. 2013); Forrest v. Transit Mgmt. of Charlotte, Inc., 245 F. App'x 255 (4th Cir. 2007); Heyward v. Monroe, No. 97-2430, 1998 WL 841494, at *2 (4th Cir. Dec. 7, 1998); Edwards v. Newport News Shipbuilding & Dry Dock Co., No. 98-1338, 1998 WL 841567, at *3 (4th Cir. Dec. 7, 1998).

[4] The parties dispute whether upon learning of his demotion, Ellington voluntarily resigned or was constructively discharged. Even if his separation could be considered an adverse employment action, such a claim fails for the same reasons as his claim alleging discriminatory demotion.



victim or society, and the culpability of the offender.' " Forrest, 245 F. App'x at 256-57 (quoting Moore v. City of Charlotte, 754 F.2d 1100, 1107 (4th Cir. 1985)). Moreover, non-supervisory employees usually will not present an apt comparison to those who hold supervisory positions. Forrest, 245 F. App'x at 257 (holding that two non-supervisory employees were not valid comparators to a supervisory employee because "th[o]se individuals were not subject to the higher standard of performance that was applicable to [the plaintiff] as a supervisor"); see also Vasquez v. Cty. of Los Angeles, 349 F.3d 634, 641 (9th Cir. 2004) ("Employees in supervisory positions are generally deemed not to be similarly situated to lower level employees."), cited in Brown v. Dir. SCDC, C/A No. 8:08-3761-HFF-BHH, 2010 WL 3167331 (D.S.C. Aug. 5, 2010).

Although Ellington provides numerous references to other CSOs whom the defendant allegedly treated less harshly, he fails to identify any similarly situated white LCSO who engaged in similar conduct as Ellington, without mitigating circumstances, who was treated differently by the defendant. (See, e.g., Pl.'s Dep. 214-15, 222, 224-25, ECF No. 39-2 at 55, 57-58; cf. Sharp Dep. 36-37, ECF No. 47-9 at 11 (stating that in the past, the defendant has demoted at least one LCSO to CSO for showing favoritism in scheduling and work assignments)). Contrary to Ellington's arguments, CSOs are not similar in all relevant respects to LCSOs to permit a valid comparison. The undisputed record shows that LCSOs had responsibilities in addition to the duties of CSOs. Specifically, under the defendant, LCSOs had the authority to assign work, set shift schedules, and enforce performance standards. (Pl.'s Dep. 125-28, ECF No. 39-2 at 33.) Further, as pointed out by the defendant, Ellington's own Complaint alleges that an LCSO is a supervisory position (Compl. ¶ 24, ECF No. 1 at 4), and Ellington himself testified that the difference between an LCSO and a CSO is that as an LCSO, he was the "work supervisor" (Pl.'s Dep. 125, ECF No. 39-2 at 33). (But

see Pl.'s Resp. Opp'n Summ. J. at 19-20, ECF No. 47 at 19-20.)  Additionally, part of the basis offered by the defendant for demoting Ellington was that he displayed favoritism in performing those additional duties and was unprofessional in addressing the CSOs.  Further underscoring the difference in position between an LCSO and a CSO is the fact that the disciplinary measure taken against Ellington was a *demotion* from LCSO to CSO,[5] and that the demotion was apparently so substantial to Ellington that he resigned rather than accept it.

Therefore, Ellington has failed to meet the *prima facie* case for disparate treatment or discipline based on his demotion, and the defendant's motion for summary judgment should be granted as to this claim.[6]

      **b.**    **Retaliation**

Claims of retaliation are also analyzed under the McDonnell Douglas burden-shifting framework.  Smith v. First Union Nat'l Bank, 202 F.3d 234, 248 (4th Cir. 2000).  Title VII makes it unlawful for an employer to retaliate against an employee for engaging in activity protected by the

---

[5] Moreover, there is no indication in the record that a demotion is an available disciplinary option for a CSO.

[6] Even if Ellington could establish a *prima facie* case of disparate treatment/discipline, he cannot show that the defendant's legitimate nondiscriminatory reason for the demotion was pretext for racial discrimination.  Ellington's arguments focus on his allegations that the investigation was biased and, to an extent, that Butler, the initial complainant, was biased.  However, the only evidence of record reveals that the decision maker, Wong, was indisputably unbiased and, in fact, was unaware of Ellington's race at the time he decided to demote Ellington.  Thus, even if Ellington could demonstrate that the investigator and the complainant exhibited discriminatory animus, such animus cannot be imputed to Wong under the circumstances in this case.  See Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 296 (4th Cir. 2004) (*en banc*) (finding that an employee is not insulated from the consequences of her own misconduct even if the decision maker would not have known of her misdeeds in the absence of a co-worker's discriminatory animus in reporting it); Robinson v. Adams, 847 F.2d 1315, 1316 (9th Cir. 1987) (holding that a Title VII disparate treatment claim failed where it was undisputed that the decision maker did not know the plaintiff's race).



statute. See 42 U.S.C. § 2000e-3(a). The requisite elements for a *prima facie* case of retaliation typically include: (1) the employee engaged in a protected activity; (2) the employer acted adversely against him or her; and (3) there was a causal connection between the protected activity and the asserted adverse action. Ziskie v. Mineta, 547 F.3d 220, 229 (4th Cir. 2008); Holland v. Washington Homes, Inc., 487 F.3d 208, 218 (4th Cir. 2007). Further, "Title VII retaliation claims must be proved according to traditional principles of but-for causation," which "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." Univ. of Tex. Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2533 (2013).

As argued by the defendant, and fatal to Ellington's attempt to establish a *prima facie* case, Ellington failed to engage in protected activity prior to the alleged adverse actions. "Protected activity" under the statute falls into one of two categories: opposition or participation. Crawford v. Metro. Gov't of Nashville & Davidson Cnty., 555 U.S. 271 (2009); Peters v. Jenney, 327 F.3d 307, 320 (4th Cir. 2003) (stating that to establish that a plaintiff engaged in protected opposition activity, she must show that she opposed an unlawful employment practice which she reasonably believed had occurred or was occurring). To constitute protected activity, a plaintiff must have conveyed to the employer a reasonable belief that the actions complained of violated federal law. Jordan v. Alternative Res. Corp., 458 F.3d 332, 340-41 (4th Cir. 2006) (stating that "an employee seeking protection from retaliation must have an objectively reasonable belief in light of all the circumstances that a Title VII violation has happened or is in progress") (citing Equal Emp't Comm'n v. Navy Federal Credit Union, 424 F.3d 397 (4th Cir. 2005)). Moreover, to prove a causal connection, a plaintiff asserting a retaliation claim must be able to show that his employer took the adverse action "*because* the plaintiff engaged in a protected activity." Holland, 487 F.3d at 218



(emphasis in original) (quoting Dowe v. Total Action Against Poverty in Roanoake Valley, 145 F.3d 653, 657 (4th Cir. 1998)).  Thus, to demonstrate causation, a plaintiff must show that the employer was aware of the protected activity.  See Shield v. Fed. Express Corp., 120 F. App'x 956, 962 (4th Cir. 2005) (citing Luckie v. Ameritech Corp., 389 F.3d 708, 715 (7th Cir. 2004)).

Ellington's Complaint alleges that the defendant retaliated against him by subjecting him to "negative employment actions, including demotion, increased scrutiny, inequitable investigation and discipline," as well as constructively discharging him.  (Compl. ¶¶ 124-27, ECF No. 1 at 17.)  The latest date that any of these allegations occurred was April 23, 2014, Ellington's last day of employment with the defendant; however, Ellington did not make his first report of race discrimination until a letter and voice message dated May 1, 2014.  His subsequently filed EEOC Charge of Discrimination based on race was not filed until May 5, 2014.  (See Pl.'s Dep. 87, 199-202, ECF No. 39-2 at 23, 51-52.)  Thus, even if Ellington's reports after his separation from employment with the defendant qualified as protected activity, there can be no causal connection between Ellington's actions and the alleged adverse actions as the alleged adverse actions occurred *prior* to any alleged protected activity.  To the extent that Ellington attempts to argue that the adverse action is the defendant's failure to investigate the complaints he made after he was no longer employed by the defendant, such a claim fails as a matter of law.  (See Pl.'s Resp. Opp'n Summ. J. at 23-25, ECF No. 47 at 23-25); see, e.g., Fincher v. Depository Trust & Clearing Corp., 604 F.3d 712, 721 (2d Cir. 2010) (holding that "an employer's failure to investigate a complaint of discrimination cannot be considered an adverse employment action taken in retaliation for the filing of the same discrimination complaint").

In response to the defendant's motion, Ellington also argues that the statement he provided to Cartee during the investigation constituted protected activity. (See Pl.'s Resp. Opp'n Summ. J. at 23, ECF No. 47 at 23) (citing ECF No. 39-8). In his deposition, Ellington appears to suggest reliance on a statement to Cartee that the CSOs congregated in two separate groups during breaks. (Pl.'s Dep. 58, 60, 88, 136-37, ECF No. 39-2 at 16, 23, 36.) However, neither of these statements conveys to the defendant any reasonable belief that the actions complained of violated federal law. See Jordan, 458 F.3d at 340-41. Moreover, Ellington agreed that his statement to Cartee was not a complaint about race discrimination but rather was about the division among the CSOs, and Ellington also agreed that the division was based on CSOs' common prior work experience—*i.e.*, either as former employees of the City of Charleston or of the State Highway Patrol.[7] (Pl.'s Dep. 86-88, ECF No. 39-2 at 23.) Finally, there is no evidence in the record that the decision maker, Wong, had any knowledge of Ellington's report of division. See Baqir v. Principi, 434 F.3d 733, 748 (4th Cir. 2006) (stating that the plaintiff must be able to show that the officials were aware of the protected activity at the time the alleged retaliation occurred); Dowe v. Total Action Against Poverty in Roanoke Valley, 145 F.3d 653, 657 (4th Cir. 1998) (stating that the decision maker's "knowledge that the plaintiff engaged in a protected activity is absolutely necessary to establish the third element of the prima facie case").

Based on the foregoing, Ellington has failed to establish a *prima facie* case of retaliation, and therefore, the defendant's motion for summary judgment should be granted as to this claim.

---

[7] The parties do not dispute that of the CSOs employed in the Charleston courthouse, the former State Highway Patrol officers were primarily Caucasian and the former City of Charleston police officers were primarily African American.



   **c.**  **Harassment/Hostile Work Environment**

  Title VII prohibits creating or allowing a hostile work environment based on race, color, religion, sex, or national origin. See Baqir, 434 F.3d at 746 n.14. Such an environment exists "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or persuasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (internal quotation marks and citations omitted) (Title VII); see also Boyer-Liberto v. Fontainebleau Corp., 786 F.3d 264, 277 (4th Cir 2015). However, "[w]orkplaces are not always harmonious locales." E.E.O.C. v. Sunbelt Rentals, Inc., 521 F.3d 306, 315-16 (4th Cir. 2008) (Title VII). Moreover, federal employment statutes are not "general civility code[s]." Oncale v. Sundower Offshore Servs., Inc., 523 U.S. 75, 80 (1998) (Title VII); Mosby-Grant v. City of Hagerstown, 630 F.3d 326, 335 (4th Cir. 2010) (Title VII).

  To make out a hostile work environment claim under federal anti-discrimination laws, a plaintiff must show that (1) he experienced unwelcome harassment; (2) the harassment was based on his race or gender; (3) the harassment was sufficiently severe or pervasive to alter the conditions of his employment and to create an abusive atmosphere; and (4) there is some basis for imposing liability on the employer. Baqir, 434 F.3d at 745-46; see also Boyer-Liberto, 786 F.3d at 277; Pueschel v. Peters, 577 F.3d 558, 564-65 (4th Cir. 2009).

  To meet the second element, a plaintiff must show that "but for" one of these protected traits, he would not have been a victim of harassment. See Causey v. Balog, 162 F.3d 795, 801 (4th Cir. 1998) (Title VII & ADEA). The federal anti-discrimination statutes do not protect employees from hostility and abuse from their supervisors unless the objectionable conditions occur because of a



protected characteristic. See Graham v. Prince George's Cnty., 191 F. App'x 202, 204 (4th Cir. 2006) (finding the district court did not err in determining that "although [the] facts reflected an unpleasant working environment, they did not support a hostile one based on an unlawful characteristic"); see also Oncale, 523 U.S. at 80.

Moreover, in a hostile work environment case, the behavior must rise to the standard of being so "severe" or "pervasive" so as to create an abusive working environment. Harris, 510 U.S. at 21; see also Baqir, 434 F.3d at 746. When analyzing this element, courts examine the totality of the circumstances, considering such factors as the frequency of the discriminatory conduct and its severity; whether it is physically threatening or humiliating or merely constitutes offensive verbal statements; and whether it unreasonably interferes with an employee's work performance. See Harris, 510 U.S. at 23; Hopkins v. Baltimore Gas & Elec. Co., 77 F.3d 745, 753 (4th Cir. 1996); see also Sunbelt Rentals, Inc., 521 F.3d at 315-16 (stating that complaints that would objectively give rise to bruised or wounded feelings or incidents that are premised on nothing more than rude treatment, callous behavior, or a routine difference of opinion and personality conflict will not satisfy the severe or pervasive standard).

The defendant argues in its motion for summary judgment that Ellington cannot show that he was subjected to unwelcome conduct so severe and pervasive as to alter the conditions of his employment. (Def.'s Mem. Supp. Summ. J. at 23-24, ECF No. 39-1 at 23-24.) In response, Ellington appears to argue that his demotion and the associated investigation constitute the basis for his claim. He summarily argues that Ellington's long career as an African American "in the deep [S]outh in a community where racial division and tension becomes more exposed every day, is clearly one in which negative racial perceptions and attitudes pervaded and polluted the workplace"

and points out that Caucasian CSOs outnumbered African-American CSOs four to one. (Pl.'s Resp. Opp'n Summ. J. at 21-22, ECF No. 47 at 21-22.)  However, a discrete act of alleged discrimination cannot form the basis for a hostile work environment claim.  See Cobbins v. Sch. Bd. of City of Lynchburg, No. 90-1754, 1991 WL 1828, at *3 (4th Cir. Jan. 23, 1991) (finding that, "absent evidence that [separate discrete acts of disparate treatment] created, perpetrated or promoted a hostile and abusive environment, they do nothing to buttress a Title VII claim"); see also Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 115 (2002) (explaining that hostile work environment claims are different in kind from discrete acts and because their very nature involves repeated conduct, hostile work environment claims cannot be said to have occurred on any particular day). Moreover, Ellington's summary arguments without any support in the record presented are insufficient to forecast evidence to show a workplace so "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or persuasive to alter the conditions of the victim's employment and create an abusive working environment." Harris, 510 U.S. at 21 (internal quotation marks and citations omitted).  Therefore, the court finds that Ellington has failed to establish a *prima facie* case of a hostile work environment based on the record in this case. Accordingly, the court concludes that no reasonable jury could find that the defendant subjected Ellington to a hostile work environment and the defendant's motion for summary judgment should be granted as to that claim.

    **2.**    **State Law Claims**

The defendant has moved, and Ellington does not oppose, the entry of summary judgment on his claim for breach of contract.



With regard to Ellington's claim of a violation of state public policy, the court finds it fails under the well-established case law that such a claim cannot lie where the plaintiff has an available statutory remedy, such as Title VII. See Heyward v. Monroe, 166 F.3d 332 (4th Cir. 1998) (finding the plaintiff's South Carolina public policy claim appropriately dismissed where the employee had a remedy under Title VII); Menton v. Nestle Prepared Foods Co., Civil Action No. 7:14-cv-02542-JMC, 2015 WL 1038121, at *7, *11 (D.S.C. Mar. 10, 2015). Whether or not the statutory remedy is successful is immaterial; it is the availability of the statutory remedy that precludes that public policy claim. See Newman v. S.C. Dep't of Emp't & Workforce, C/A No. 3:10-942-CMC-PJG, 2010 WL 4666360 (D.S.C. Nov. 18, 2010) (holding that although the available remedies under the Grievance Act and the Whistleblower Act may be limited and impose procedural hurdles to recovery, the availability of these remedies precludes a Ludwick public policy claim).

## RECOMMENDATION

Based on the foregoing, the court recommends that the defendant's motion for summary judgment be granted (ECF No. 39).[8]

_____
Paige J. Gossett
UNITED STATES MAGISTRATE JUDGE

January 12, 2017
Columbia, South Carolina

*The parties' attention is directed to the important notice on the next page.*

---

[8] Because Ellington's civil rights claim under 42 U.S.C. § 1981 rises or falls with his Title VII claim, this claim fails as well. See Gairola v. Va. Dep't of Gen. Servs., 753 F.2d 1281, 1285 (4th Cir. 1985) ("Under Title VII and either § 1981 or § 1983, the elements of the required *prima facie* case are the same."); see also Love-Lane v. Martin, 355 F.3d 766, 786 (4th Cir. 2004) (stating that the McDonnell Douglas burden shifting framework, developed for Title VII, has been applied to § 1981 claims).

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.' " Diamond v. Colonial Life & Acc. Ins. Co., 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); see Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

> Robin L. Blume, Clerk
> United States District Court
> 901 Richland Street
> Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).